**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

| | |
|---|---|
| **SAMUEL ABRAHAM KAUFMAN,** individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>**v.**<br><br>**FORRESTALL CPAS, LLC,**<br><br>Defendant. | Case No.<br><br>**COMPLAINT - CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Samuel Abraham Kaufman ("Plaintiff"), individually and on behalf of all others similarly situated ("Class Members"), brings this action against Defendant Forrestall CPAs, LLC ("Forrestall" or "Defendant"), alleging as follows:

## NATURE OF THE CASE

1. Plaintiff brings this class action lawsuit on behalf of all persons who entrusted Defendant with personally identifiable information ("PII" or "Private Information") that was compromised in a data breach of Defendant's computer network occurring between approximately December 22, 2025, and December 30, 2025 (the "Data Breach"). Defendant's investigation determined that an unauthorized individual accessed its network and viewed and obtained files containing that Private Information.

2. Plaintiff's claims arise from Defendant's failures to properly secure and safeguard the Private Information that was entrusted to it, and the breach of its accompanying responsibilities to store and transfer that information.

3. Between approximately December 22, 2025 and December 30, 2025, an unauthorized actor accessed Defendant's network and viewed and obtained files containing Plaintiff's and Class Members' Private Information stored therein, causing widespread injuries to Plaintiff and Class Members.

4. Defendant is a public accounting firm based in the metro Atlanta area that provides tax, audit, retirement, and advisory services to both individuals and

business organizations. The organizations for which Defendant provides services are referred to herein as "Defendant's Clients" or "Clients."

5. As part of its business practices and in order to provide its services, Defendant collects, stores, and maintains the Private Information of its own customers and of the employees of its Clients, including Plaintiff and Class Members. Plaintiff and Class Members had no meaningful choice but to entrust Defendant with the collection, storage, and safeguarding of that Private Information. By collecting and storing Plaintiff's and Class Members' Private Information, Defendant assumed a duty to secure, maintain, protect, and safeguard the Private Information it collects against unauthorized access and disclosure through reasonable and adequate data security measures.

6. Defendant had numerous statutory, regulatory, contractual, and common law duties and obligations, including those based on its affirmative representations to Plaintiff and Class Members, to keep their Private Information confidential, safe, secure, and protected from unauthorized disclosure or access.

7. Although the Data Breach began on or about December 22, 2025, Defendant waited nearly eight months—until on or about August 18, 2026—to begin

mailing notice letters to affected individuals, including Plaintiff, informing them that their Private Information had been compromised (the "Notice").[1]

8. Defendant also reported the Data Breach to state regulators, including the Attorneys General of Texas, Massachusetts, and California, reporting at least 3,725 affected residents in Texas and at least 218 affected residents in Massachusetts.

9. Defendant also placed a Notice of Data Security on its firm website, containing substantially the same information as the Notice.[2]

10. Despite Defendant's duty to safeguard the Private Information of its customers and of the employees of its Clients, Plaintiff's and Class Members' Private Information was compromised in the Data Breach, wherein there was unauthorized access to Defendant's network and files were viewed and obtained.

11. The Data Breach occurred in part because of Defendant's failures to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect individuals' Private Information.

---

[1] Forrestall CPAs, LLC, *Notice of Data Breach (sample notification letter)*, Office of the Cal. Att'y Gen., https://oag.ca.gov/system/files/Forrestall%20CPAs%20-%20CA%20Notification%20Letter%20Sample.pdf (last visited Aug. 27, 2026).

[2] Forrestall CPAs, LLC, *Notice of Data Security Incident*, https://www.classaction.org/media/forrestall-cpas-data-breach-web-notice-2026.pdf (last visited Aug. 27, 2026).

12. As a direct and proximate result of Defendant's failure to implement and follow basic security procedures, Plaintiff's and Class Members' Private Information is now exposed to cybercriminals.

13. In its Notice, Defendant offered affected individuals, including Plaintiff, a complimentary one-year membership in identity monitoring services through Epiq.

14. As explained herein, all of the steps taken by Defendant are woefully inadequate to ameliorate the real and substantial harm caused to Plaintiff and Class Members.

15. Upon information and belief, Plaintiff's and Class Members' Private Information is available on the dark web or otherwise in the hands of cybercriminals as a result of the Data Breach.

16. Defendant owes a duty to the individuals whose Private Information it collects and maintains—including its own customers and the current and former employees of its Clients—to adopt reasonable measures to protect their Private Information from disclosure to unauthorized third parties, and to keep it safe and confidential. This duty arises under contract, statutory and common law, industry standards, representations made to Plaintiff and Class Members, and because it is foreseeable that the exposure of Private Information to unauthorized persons—and especially hackers with nefarious intentions—will harm the affected individuals,

including but not limited to the invasion of their private financial matters.

17. In providing their Private Information to Defendant, directly or indirectly, Plaintiff and Class Members reasonably expected that this sophisticated business entity would keep their Private Information confidential and securely maintained, use this information only for the accounting, tax, and advisory purposes for which it was provided, and disclose it only as authorized. Defendant failed to do so, resulting in the unauthorized disclosure of Plaintiff's and Class Members' Private Information in the Data Breach.

18. Defendant breached the duties it owed to Plaintiff and Class Members by failing to safeguard the Private Information it collected and maintained, including by failing to implement industry standards for data security to protect against cyberattacks.

19. Defendant failed to adequately protect Plaintiff's and Class Members' Private Information, which was, in turn, compromised due to Defendant's negligent and/or careless acts and omissions and its utter disregard for the privacy of the individuals whose Private Information it holds.

20. Hackers targeted and obtained Plaintiff's and Class Members' Private Information from Defendant's systems because of the data's value in exploiting and stealing their identities. As a direct and proximate result of Defendant's inadequate data security and breaches of its duties to handle Private Information with reasonable

care, the risk of identity theft caused by this Data Breach is impending and has materialized, as Plaintiff's and Class Members' Private Information was targeted, accessed, and obtained. This present and continuing risk to victims of the Data Breach will remain for their respective lifetimes.

21. As a result of the Data Breach, Plaintiff and Class Members suffered concrete injuries in fact including, but not limited to (a) costs mitigating the materialized and imminent risk of identity theft; (b) loss of time and productivity mitigating the materialized and imminent risk of identity theft; (c) deprivation of value of their Private Information; (d) loss of privacy; (e) emotional distress; and (f) the continued risk to their Private Information, which remains subject to further breaches so long as Defendant fails to undertake adequate measures to protect it.

22. To recover for these harms, Plaintiff, on behalf of himself and the Class as defined herein, brings claims for negligence/negligence per se, breach of implied contract, unjust enrichment, declaratory judgment, and violation of the New York General Business Law against Defendant.

## PARTIES

23. Plaintiff Samuel Abraham Kaufman is an individual and a citizen and resident of the State of New York, residing in Lawrence, New York.

24. Defendant Forrestall CPAs, LLC is a Georgia limited liability company with its headquarters and principal place of business located at 5328 Lanier Islands

Parkway, Suite 201, Buford, Georgia 30518-3200.

25. Defendant is a certified public accounting firm that provides tax, audit, retirement, and advisory services to individuals and business organizations. In the ordinary course of its business, Defendant receives, stores, and maintains the highly sensitive Private Information of its own customers and of the current and former employees of its Clients, including Plaintiff and Class Members.

## JURISDICTION AND VENUE

26. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the amount in controversy exceeds $5 million, exclusive of interest and costs, the number of Class Members exceeds 100, and members of the Class are citizens of states different from Defendant. Plaintiff is a citizen of New York. Defendant, as a limited liability company, is a citizen of Georgia—the state under whose laws it is organized and in which it maintains its principal place of business. *See* 28 U.S.C. § 1332(d)(10). Defendant has reported affected individuals in multiple states diverse from Georgia, including at least 3,725 residents of Texas, at least 218 residents of Massachusetts, and at least 500 residents of California. The jurisdictional amount is satisfied because the aggregated claims of the thousands of Class Members exceed $5,000,000, including the reasonable and necessary cost of credit and identity-theft monitoring alleged herein of approximately $200 per Class Member per year, the

diminished value of Plaintiff's and Class Members' Private Information, statutory damages of at least $50 for each member of the New York Subclass under N.Y. Gen. Bus. Law § 349(h), and the injunctive relief and attorneys' fees sought.

27. This Court has personal jurisdiction over Defendant because Defendant is organized under the laws of the State of Georgia, its headquarters and principal place of business are located in Georgia, it regularly conducts business in Georgia, and the acts and omissions giving rise to Plaintiff's claims occurred in Georgia.

28. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2) because Defendant's principal place of business is located in this District, Defendant resides in this District, and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims—including the decisions regarding the data security practices applied to the network on which Plaintiff's and Class Members' Private Information was stored—occurred in this District.

29. Divisional Assignment: This action is properly assigned to the Gainesville Division because Defendant's headquarters and principal place of business are located in Hall County, Georgia, and a substantial part of the events giving rise to the claims asserted herein occurred in that county.

## GENERAL FACTUAL ALLEGATIONS

### A. Defendant Collected and Maintained Plaintiff's and Class Members' Private Information to Operate and Facilitate Its Business.

30. Forrestall, headquartered in Buford, Georgia, is a public accounting

firm based in the metro Atlanta area that provides tax, audit, retirement, and advisory services to both individuals and business organizations.

31. Defendant maintains a publicly available privacy policy on its website addressing its collection and handling of the personal information provided to it, and in doing so represents to the individuals whose Private Information it collects that it takes measures to protect that information.

32. Defendant does not employ Plaintiff and most Class Members. Rather, Defendant obtains, stores, and maintains their Private Information in the course of providing accounting, tax, retirement, and advisory services—both to individuals directly and to its Clients, including the current and former employers of Class Members.

33. Plaintiff's and Class Members' Private Information—including their names, dates of birth, and Social Security numbers—was provided to Defendant, either directly by them or indirectly by Defendant's Clients, as a necessary condition of obtaining accounting, tax, payroll, retirement, or advisory services. Plaintiff and Class Members had no meaningful choice but to entrust Defendant with the collection, storage, and safeguarding of that Private Information.

34. At all relevant times, Defendant was using its systems to manage, store, and transmit valuable, sensitive Private Information belonging to its customers and to the current and former employees of its Clients, and knew or should have known

that systems storing Social Security numbers and dates of birth for thousands of individuals would be attractive targets for cybercriminals.

35. But for Defendant's undertaking to keep Plaintiff's and Class Members' Private Information secure and confidential, Plaintiff and Class Members would not have provided, or permitted others to provide, their Private Information to Defendant.

**B. Defendant Owed Duties to Adopt Reasonable Data Security Measures for the Private Information It Collected and Maintained.**

36. As part of its business, Defendant collects and maintains thousands of individuals' Private Information, including that of Plaintiff and Class Members.

37. Defendant had and continues to have duties to adopt reasonable measures to keep Plaintiff's and Class Members' Private Information protected from unauthorized disclosure, and to audit, monitor, and verify the integrity of its networks and those of its vendors.

38. Defendant's obligations stem from the Federal Trade Commission ("FTC") Act, 15 U.S.C. § 45, common law, contract, industry standards, and representations made to Plaintiff and Class Members, to keep their Private Information confidential and protected from unauthorized disclosure.

39. Plaintiff and Class Members value the confidentiality of their Private Information and demand security to safeguard their Private Information. To that end, Plaintiff and Class Members have taken reasonable steps to maintain the

confidentiality of their Private Information and would not have provided it, or permitted it to be provided, to Defendant or anyone in Defendant's position absent an understanding that Defendant would implement reasonable and industry standard data security practices.

40. Additionally, by obtaining, using, and benefitting from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties and knew it was responsible for protecting that Private Information from unauthorized access and disclosure.

41. Defendant's duty to protect Plaintiff and Class Members from the foreseeable risk of injury that inadequate data protection and unauthorized exposure of their Private Information would cause obligated Defendant to implement reasonable practices to keep Plaintiff's and Class Members' sensitive Private Information confidential and securely maintained, to use and disclose it for necessary and authorized purposes only, and to delete it from network systems when no longer necessary for legitimate business purposes. Defendant failed to do so.

**C. Defendant's Network Was Breached by an Unauthorized Actor.**

42. Between approximately December 22, 2025 and December 30, 2025, an unauthorized actor accessed Defendant's network and viewed and obtained files containing the Private Information of Plaintiff and Class Members.

43. According to the Texas Attorney General's Data Security Breach

Report, the Private Information compromised in the Data Breach included names of individuals, addresses, Social Security number information, financial information (e.g. account number, credit or debit card number), health insurance information, and dates of birth.[3]

44. In response to the Data Breach, Defendant offered affected individuals a complimentary one-year membership in identity monitoring services through Epiq and advised them to monitor their accounts for suspicious activity—an offer that is inadequate given the lifetime risk created by the exposure of immutable data such as Social Security numbers and dates of birth.

45. As such, experts recommend continued dark web monitoring by individuals who may have been impacted by the Data Breach.

**D. Defendant's Failures to Adequately Safeguard Plaintiff's and Class Members' Private Information Caused the Data Breach.**

46. On or about August 18, 2026—nearly eight months after the unauthorized access began—Defendant began notifying affected individuals ("Notice"). Prior to that date, Plaintiff and Class Members remained unaware that their Private Information had been compromised and unable to take protective measures.

[3] Tex. Att'y Gen., *Data Security Breach Reports* (Notice of Data Event: Forrestall CPAs, LLC), https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (last visited Aug. 27, 2026).

47. The Notice generally informs as follows, in part:

> Forrestall CPAs LLC recognizes the importance of protecting the personal information we maintain. We are writing to inform you of a security incident that involved some of your information. This notice explains the incident, the measures we have taken, and some steps you may consider taking in response.
>
> We recently concluded an investigation into an incident involving unauthorized access to certain of our systems. Upon discovering the incident, we took measures to secure our systems and launched an investigation. A cybersecurity firm was engaged to assist. Our investigation determined that an unauthorized individual viewed and obtained certain files on our network.
> We reviewed those files and determined that one or more of them included your name and date of birth and Social Security number. [4]

48. Omitted from the Notice were the dates of the breach, details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained to Plaintiff and Class Members, who retain a vested interest in ensuring their Private Information is protected.

49. Indeed, the Identity Theft Resource Center's 2024 Annual Data Breach Report notes that, "approximately 70 percent of cyberattack-related breach notices did not include attack information, compared to 58 percent in 2023. In 2019 and previous years, ~100 percent of breach notices included attack vector information." Eva Velasquez, CEO of the Identity Theft Resource Center, remarked that "[w]ith a

[4] *See* Forrestall CPAs, LLC, *supra* note 1, at 1.

near-record number of compromises and over 1.3 billion victim notices, often tied to inadequate cyber practices, we are also seeing an increase in notices that provide limited actionable information for victims."[5]

50. In a 2019 study, researchers found that "97 percent of the 161 sampled notifications were difficult or fairly difficult to read based on readability metrics, and that the language used in them may have contributed to confusion about whether the recipient of the communication was at risk and should take action." The researchers went on to note that breached entities "use hedge terms that downplay risk—using phrases like 'you might be affected' and 'you are likely to be affected'" as "[f]or most companies, those notifications are only seen as a requirement for complying with data breach notification laws rather than a way to educate and protect their customers."[6]

51. Thus, Defendant's purported disclosure amounts to no real disclosure at all, as it fails to inform Plaintiff and Class Members of the Data Breach's critical facts with any degree of specificity. Without these details, Plaintiff's and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

---

[5] *2024 Annual Data Breach Report Reveals Near-Record Number of Compromises and Victim Notices*, Identity Theft Res. Ctr. (Jan. 28, 2025), https://www.idtheftcenter.org/post/2024-annual-data-breach-report-near-record-compromises/ (last visited Aug. 27, 2026).

[6] Yixin Zou, *Companies Send Confusing Alerts About Data Breaches*, Futurity (May 19, 2019), https://www.futurity.org/data-breaches-notifications-2066072/ (last visited Aug. 27, 2026).

52. Based on the value to cybercriminals of the Private Information in its possession, Defendant knew or should have known the importance of safeguarding the information entrusted to it and of the foreseeable consequences if its data security systems were breached.

53. As the Data Breach evidences, Defendant did not use reasonable security measures appropriate to the nature of the sensitive Private Information it collected and maintained from Plaintiff and Class Members, such as encrypting the information or deleting it when it is no longer needed. These failures by Defendant allowed and caused cybercriminals to target Plaintiff's and Class Members' Private Information on Defendant's systems and carry out the Data Breach.

54. Defendant failed to use reasonable security procedures and practices appropriate to the sensitive and confidential nature of Plaintiff's and Class Members' Private Information it collected and maintained, such as encrypting files containing Private Information, requiring multi-factor authentication ("MFA") for initial access to servers containing Private Information, or deleting Private Information from network systems when it is no longer needed.

55. Defendant could have prevented this Data Breach by properly securing and encrypting the files and servers containing Private Information, using controls like limitations on personnel with access to sensitive data and requiring MFA for access, training employees on standard cybersecurity practices, and implementing

reasonable logging and alerting methods to detect unauthorized access or the transfer of large volumes of data to third-party networks.

56. For example, had Defendant implemented industry standard logging, monitoring, and alerting systems—basic technical safeguards that any Private Information-collecting business is expected to employ—then cybercriminals would not have been able to perpetrate prolonged malicious activity in Defendant's network systems for days without being detected. Due to Defendant's failures, these cybercriminals were able to conduct the reconnaissance necessary to identify where Private Information was stored, install malware or other methods of establishing persistence and creating a path to exfiltrate data, stage data, or exfiltrate that data outside of Defendant's systems, all without being caught.

57. Defendant would have recognized the malicious activities detailed in the preceding paragraph had it bothered to implement basic monitoring and detection systems, which then would have stopped the Data Breach or greatly reduced its impact.

58. In addition, Defendant could have prevented this Data Breach by implementing or requiring such reasonable safeguards as properly securing, sanitizing, and encrypting the files and servers containing Plaintiff's and Class Members' Private Information, but failed to do so.

**E. Defendant Knew the Risk of a Data Breach Because Businesses in**

**Possession of Private Information Are Particularly Susceptible.**

59. Defendant's negligence in failing to safeguard Plaintiff's and Class Members' Private Information is exacerbated by the repeated warnings and alerts regarding the need to protect and secure sensitive data.

60. Data thieves regularly target businesses like Defendant—and accounting firms in particular—due to the sensitive information that such entities maintain. Defendant knew and understood that unprotected Private Information is highly sought after by criminals who seek to illegally monetize that Private Information through unauthorized access.

61. In light of past high profile data breaches, Defendant knew or should have known the Private Information it collected and maintained would be vulnerable and targeted by cybercriminals.

62. Defendant's data security obligations were particularly important given the substantial increase, preceding the date of the Data Breach, in cyberattacks and/or data breaches targeting entities like Defendant that collect and store Private Information.

63. In 2023, an all-time high for data compromises occurred, with 3,205 compromises affecting 353,027,892 total victims.[7] The estimated number of

[7] *See 2023 Annual Data Breach Report, Identity Theft Res. Ctr. (Jan. 2024),* https://www.idtheftcenter.org/wp-content/uploads/2024/01/ITRC_2023-Annual-Data-Breach-Report.pdf (last visited Aug. 27, 2026).

organizations impacted by data compromises has increased by +2,600 percentage points since 2018, and the estimated number of victims has increased by +1,400 percentage points.[8] The 2023 compromises represent a 78 percent point increase over the previous year and a 72 percentage point hike from the previous all-time high number of compromises (1,860) set in 2021.[9]

64. In 2024, these numbers held steady—with 3,158 total compromises and 1,350,835,988 victim notices accompanying those compromises, representing a 211 percent increase year over year.[10]

65. Given the nature of the Data Breach, it was foreseeable that Plaintiff's and Class Members' Private Information compromised therein would be targeted by hackers and cybercriminals for use in a variety of different injurious ways. Indeed, the cybercriminals who possess Plaintiff's and Class Members' Private Information can easily obtain their tax returns or open fraudulent credit card accounts in Plaintiff's and Class Members' names.

66. Defendant was, or should have been, fully aware of the unique type and the significant volume of data on its systems, amounting to thousands of individuals' detailed Private Information, and, thus, that these individuals would be harmed by

---

[8] *Id.*
[9] *Id.*
[10] *See 2024 Annual Data Breach Report, Identity Theft Res. Ctr. (Jan. 2025),* https://www.idtheftcenter.org/publication/2024-data-breach-report/ (last visited Aug. 27, 2026).

the unauthorized disclosure of that unencrypted data.

67. Plaintiff and Class Members were the foreseeable and probable victims of Defendant's inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing Private Information and the critical importance of providing adequate security for that information.

**F. Defendant Was Required to Comply with FTC Rules and Guidance, But Failed to Do So.**

68. Defendant is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

69. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[11]

70. In 2016, the FTC updated its publication, *Protecting Personal*

[11] *Start with Security: A Guide for Business, Fed. Trade Comm'n (2015),* https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited Aug. 27, 2026).

*Information: A Guide for Business*,[12] which establishes cyber-security guidelines for businesses like Defendant. These guidelines note that businesses should protect the consumer Private Information they keep; properly dispose of Private Information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

71. Among other guidance, the FTC recommends the following cybersecurity guidelines for businesses in order to protect sensitive information in their systems: [13]

a. Identify all connections to the computers where sensitive information is stored;

b. Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks;

c. Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business;

d. Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should

[12] *Protecting Personal Information: A Guide for Business, Fed. Trade Comm'n,* https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited Aug. 27, 2026).
[13] *Id.*

consider closing the ports to those services on that computer to prevent unauthorized access to that machine;

e. Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hack attacks;

f. Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet;

g. Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically;

h. Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day; and

i. Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business's network, the transmission should be investigated to make sure it is authorized.

72. The FTC's guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

73. The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity; and verify that service providers have reasonable security measures.

74. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect third parties' confidential data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. *See, e.g., In the Matter of LabMD, Inc*., 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (F.T.C. July 28, 2016) ("LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

75. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits unfair practices including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information.

76. The FTC has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated, "Data is currency. The larger the data set, the greater potential

for analysis and profit."[14]

77. Defendant failed to properly implement basic data security practices. Defendant's failures to employ reasonable and appropriate measures to protect against unauthorized access to its customers' Private Information constitute unfair acts or practices prohibited by Section 5 of the FTC Act.

78. Defendant was at all times fully aware of its obligations to protect the Private Information of its customers, including that of Plaintiff and Class Members. Defendant was also aware of the significant repercussions that would result from a failure to properly secure the Private Information it maintained.

### G. Defendant Failed to Comply with Industry Standards.

79. Experts studying cybersecurity routinely identify corporations in possession of Private Information as being particularly vulnerable to cyberattacks because of the value of the Private Information that they collect and maintain.

80. Several best practices have been identified that—at a minimum—should be implemented by businesses like Defendant. These industry standards include but are not limited to: educating all employees regarding cybersecurity; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor

[14] Pamela Jones Harbour, Comm'r, Fed. Trade Comm'n, *Remarks Before the FTC Exploring Privacy Roundtable* (Dec. 7, 2009), https://www.ftc.gov/news-events/news/speeches/remarks-ftc-exploring-privacy-roundtable (last visited Aug. 27, 2026).

authentication; backup data; and limiting which employees can access sensitive data.

81. Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

82. Moreover, companies should retain personal data only as necessary, with legal justification. Personal data should not be stored beyond the time necessary to achieve its initial purpose of collection. In line with industry standard practices, Defendant should have promptly deleted any data it no longer needed to provide services to Plaintiff and the Class.

83. A number of industry and national best practices have been published and are widely used as a go-to resource when developing an institution's cybersecurity standards.

84. The Center for Internet Security's (CIS) Critical Security Controls (CSC) recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection,

Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.

85. In addition, NIST recommends certain practices to safeguard systems, such as the following:

a. Control who logs on to your network and uses your computers and other devices;
b. Use security software to protect data;
c. Encrypt sensitive data, at rest and in transit;
d. Conduct regular backups of data;
e. Update security software regularly, automating those updates if possible;
f. Have formal policies for safely disposing of electronic files and old devices; and
g. Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their personal risk in addition to their crucial role in the workplace. [15]

86. Upon information and belief, Defendant failed to implement industry standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01,

---

[15] *Understanding the NIST Cybersecurity Framework, Fed. Trade Comm'n,* https://www.ftc.gov/business-guidance/blog/2018/11/cybersecurity-small-business-understanding-nist-cybersecurity-framework (last visited Aug. 27, 2026).

PR.DS-01, PR.DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the CIS CSC, which are established frameworks for reasonable cybersecurity readiness, as well as failing to comply with other industry standards, resulting in the Data Breach.

87. Further, Defendant had a duty to ensure that its vendors, to whom it gave access to Plaintiff's and Class Members' highly sensitive Private Information, had adequate security measures to prevent cybercriminals from gaining access to the Private Information stored on Defendant's servers.

### H. Defendant Owed Plaintiff and Class Members Common Law Duties to Safeguard Their Private Information.

88. In addition to its obligations under federal and state laws, Defendant owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. These duties obligated Defendant to provide reasonable data security consistent with industry standards and requirements to protect Plaintiff's and Class Members' Private Information in its care from unauthorized disclosure.

89. Defendant owed duties to Plaintiff and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in its possession, including adequately training its employees and others

who accessed Private Information on how to adequately protect Private Information.

90. Defendant owed duties to Plaintiff and Class Members to implement processes that would detect a compromise of Private Information in a timely manner.

91. Defendant owed duties to Plaintiff and Class Members to act upon data security warnings and alerts in a timely fashion.

92. Defendant owed duties to Plaintiff and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred.

93. Defendant owed duties to Plaintiff and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

94. Defendant failed to take the necessary precautions to safeguard and protect Plaintiff's and Class Members' Private Information from unauthorized disclosure. Defendant's actions and omissions represent a flagrant disregard of Plaintiff's and Class Members' rights.

**I. Defendant Could Have Prevented the Data Breach.**

95. Data breaches are preventable.[16] As Lucy Thompson wrote in the *Data Breach and Encryption Handbook*, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[17] She added that "[o]rganizations

[16] Lucy L. Thompson, *Despite the Alarming Trends, Data Breaches Are Preventable*, in *Data Breach and Encryption Handbook* (Lucy L. Thompson ed., 2012).
[17] *Id.* at 17.

that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[18]

96. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures . . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs." [19]

97. In a Data Breach like the one here, many failures laid the groundwork for the Data Breach. For example, the FTC has published guidelines that establish reasonable data security practices for businesses. The guidelines also emphasize the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.

98. Defendant failed to adequately protect Plaintiff's and Class Members' Private Information despite its knowledge of the risk of such a Data Breach occurring, and Defendant failed to take even basic measures to prevent the data breach. For example, Defendant failed to even encrypt or redact Plaintiff's and Class Members' highly sensitive data. This unencrypted, unredacted Private Information was compromised due to Defendant's negligent and/or careless acts and omissions

---

[18] *Id.* at 28.
[19] *Id.*

and its utter disregard for Class Members' privacy as well as Defendant's failure to fulfill its obligations to implement effective cybersecurity practices and policies.

**J. Plaintiff and Class Members Suffered Common Injuries and Damages.**

99. Defendant's failure to implement or maintain adequate data security measures directly and proximately caused Plaintiff's and Class Members' injuries via the Data Breach.

100. The ramifications of Defendant's failures to keep secure the Private Information of Plaintiff and Class Members are long lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

101. Plaintiff and Class Members are also at a continued risk because their Private Information remains in Defendant's systems, which have already been shown to be susceptible to compromise and are subject to further attack so long as Defendant fails to undertake the necessary and appropriate security and training measures to protect its customers' Private Information.

102. As a result of Defendant's ineffective and inadequate data security practices, the consequential Data Breach, and the foreseeable outcome of Plaintiff's and Class Members' Private Information ending up in criminals' possession, all Plaintiff and Class Members have suffered and will continue to suffer numerous actual injuries and damages.

***Present and Ongoing Risk of Identity Theft***

103. Plaintiff and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

104. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[20] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[21] According the the State of New York, "identity thieves have your personal information, they can drain your bank account, run up charges on your credit cards, open new utility accounts, or get medical treatment on your health insurance."[22]

105. The types of Private Information accessed and compromised here can be used to perpetrate fraud and identity theft.

---

[20] 12 C.F.R. § 1022.3(h) (2025). The Federal Trade Commission originally defined these terms at 16 C.F.R. § 603.2. The Dodd-Frank Wall Street Reform and Consumer Protection Act transferred most Fair Credit Reporting Act rulemaking authority to the Consumer Financial Protection Bureau effective July 21, 2011; the Commission then rescinded 16 C.F.R. pt. 603, *see* 77 Fed. Reg. 22,200 (Apr. 13, 2012), and the definitions now appear in the Bureau's Regulation V at 12 C.F.R. § 1022.3.

[21] *12 C.F.R. § 1022.3.*

[22] *Prevention and Preparedness, N.Y. State Police,* https://troopers.ny.gov/prevention-and-preparedness (last visited Aug. 27, 2026).

106. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize it. Criminals monetize the data by selling the stolen information on the internet black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

107. Stolen Private Information is often trafficked on the "dark web," a heavily encrypted part of the internet that is not accessible via traditional search engines. Law enforcement has difficulty policing the "dark web" due to this encryption, which allows users and criminals to conceal their identities and online activity.

108. The dark web is an unindexed layer of the internet that requires special software or authentication to access.[23] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[24] This prevents dark web marketplaces from being easily monitored by authorities or

[23] *What Is the Dark Web?, Experian,* https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last visited Aug. 27, 2026).
[24] *Id.*

accessed by those not in the know.

109. A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, personal information like the Private Information at issue here.[25] The digital character of Private Information stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and medical information.[26] As Kaspersky warns "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others."[27]

110. When malicious actors infiltrate companies and copy and exfiltrate the Private Information that those companies store, the stolen information often ends up on the dark web where malicious actors buy and sell that information for profit.[28]

111. For example, when the U.S. Department of Justice announced its

---

[25] *What Is the Deep and Dark Web?, Kaspersky,* https://www.kaspersky.com/resource-center/threats/deep-web (last visited Aug. 27, 2026).
[26] EXPERIAN, *SUPRA* NOTE 23.
[27] KASPERSKY, *SUPRA* NOTE 25.
[28] *Shining a Light on the Dark Web with Identity Monitoring, IdentityForce (Dec. 28, 2020),* https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring (last visited Aug. 27, 2026).

seizure of AlphaBay—the largest online "dark market"—in 2017, AlphaBay had more than 350,000 listings, many of which concerned stolen or fraudulent documents that could be used to assume another person's identity.[29] Marketplaces similar to the now-defunct AlphaBay continue to be "awash with [Private Information] belonging to victims from countries all over the world."[30]

112. The unencrypted Private Information of Plaintiff and Class Members will end up for sale on the dark web because that is the *modus operandi* of hackers. In addition, unencrypted and detailed Private Information may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized actors can easily access and misuse Plaintiff's and Class Members' Private Information due to the Data Breach.

113. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

114. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more

---

[29] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web, Armor (Apr. 3, 2018),* https://res.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud-dark-web/ (last visited Aug. 27, 2026).
[30] *Id.*

information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

115. One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[31]

116. With Fullz packages, cybercriminals can cross-reference two sources of Private Information to marry unregulated data to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

[31] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, Social Security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, Krebs on Security (Sept. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm (last visited Aug. 27, 2026).

117. The development of Fullz packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. Thus, even if certain information was not stolen in the data breach, criminals can still easily create a comprehensive Fullz package.

118. Identity thieves can also use an individual's personal data and Private Information to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's information, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name.[32]

[32] *Identity Theft and Your Social Security Number, Soc. Sec. Admin. (2018),* https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Aug. 27, 2026).

119. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice,

> A direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees).[33]

120. According to the FBI's Internet Crime Complaint Center (IC3) 2024 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $16 billion in losses to individuals and business victims.[34]

121. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." Yet, Defendant failed to rapidly report to Plaintiff and the Class that their Private Information was stolen.[35]

122. Victims of identity theft also often suffer embarrassment, blackmail, or

---

[33] Erika Harrell, Bureau of Just. Stat., U.S. Dep't of Just., NCJ 256085, *Victims of Identity Theft, 2018* (2020), https://bjs.ojp.gov/content/pub/pdf/vit18.pdf (last visited Aug. 27, 2026).

[34] *INTERNET CRIME REPORT 2024*, FED. BUREAU OF INVESTIGATION, HTTPS://WWW.IC3.GOV/ANNUALREPORT/REPORTS/2024_IC3REPORT.PDF (LAST VISITED AUG. 27, 2026).

[35] *Id.*

harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

123. In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their Private Information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

124. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen Private Information. To protect themselves, Plaintiff and Class Members will need to remain vigilant for years or even decades to come.

***Loss of Time to Mitigate the Risk of Identity Theft and Fraud***

125. As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, a reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft or fraud. Failure to spend time taking steps to review accounts or credit reports could expose the

individual to greater financial harm—yet the asset of time has been lost.

126. If Plaintiff and Class Members experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[36]

127. Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class Members must monitor their financial accounts for many years to mitigate that harm.

128. Plaintiff and Class Members have spent time, and will spend additional time in the future, on a variety of prudent actions, such as placing freezes and alerts with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports. These efforts are consistent with the steps the FTC recommends that data breach victims take to protect their personal and financial information after a data breach.

129. Once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future

---

[36] *See U.S. Gov't Accountability Off., GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown, at 2 (2007),* https://www.gao.gov/new.items/d07737.pdf (last visited Aug. 27, 2026).

misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives, as a result of Defendant's conduct that caused the Data Breach.

***Diminished Value of Private Information***

130. Private Information is a valuable property right.[37] Its value is axiomatic, considering the value of data in corporate America and the fact that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates beyond doubt that Private Information has considerable market value.

131. Private Information can be sold at prices ranging from $40 to $200.[38] Criminals can also purchase access to entire company data breach sets for $900 to $4,500.[39]

132. An active and robust legitimate marketplace for personal information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[40]

---

[37] *See, e.g.*, John T. Soma et al., *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, *3–4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[38] *Here's How Much Your Personal Information Is Selling for on the Dark Web, Experian (Dec. 6, 2017),* https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Aug. 27, 2026).

[39] *In the Dark, VPNOverview (2019),* https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Aug. 27, 2026).

[40] David Lazarus, *Shadowy Data Brokers Make the Most of Their Invisibility Cloak*, L.A. Times (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited Aug. 27, 2026).

In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[41, 42] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50 a year.[43]

133. As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished in its value by its unauthorized and likely release onto the dark web, where it holds significant value for the threat actors.

134. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

***Reasonable and Necessary Future Cost of Credit and Identity Theft Monitoring***

135. To date, Defendant has done little to nothing to provide Plaintiff and Class Members with relief for the damages they have suffered due to the Data Breach. Defendant offered affected individuals only one year of complimentary

---

[41] DATACOUP, HTTPS://DATACOUP.COM/ (LAST VISITED AUG. 27, 2026).
[42] Digi.me, https://web.archive.org/web/20260130231214/https://digi.me/ (last visited Aug. 27, 2026).
[43] *Frequently Asked Questions, Nielsen Computer & Mobile Panel,* https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Aug. 27, 2026).

identity monitoring services through Epiq, which is inadequate given that the exposure of Social Security numbers and dates of birth creates a lifetime risk.

136. Unsurprisingly, given the type of targeted attack and sophisticated criminal activity, the type of Private Information involved, and the *modus operandi* of cybercriminals, there is evidence that at least entire batches of stolen information have been placed on the dark web for sale and purchase by criminals intending to utilize it for identity theft crimes.

137. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

138. Furthermore, the information involved in the Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers and dates of birth), and thus significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close card accounts.

139. The retail cost of credit monitoring and identity theft monitoring can cost $200 or more a year per Class Member, which is a reasonable and necessary cost to protect against the risk of identity theft that the Data Breach caused, which

Plaintiff and Class Members would not need to bear but for Defendant's failure to safeguard their Private Information.

***Lost Benefit of the Bargain***

140. Furthermore, Defendant's poor data security deprived Plaintiff and Class Members of the benefit of their bargain.

141. When agreeing to provide their Private Information, which was a condition precedent to obtaining accounting, tax, payroll, retirement, or advisory services, and paying Defendant, directly or indirectly, for those services, Plaintiff and Class Members understood and expected they were, in part, paying for legally required data security to protect the Private Information they were required to provide.

## K. Plaintiff's Experience and Injuries.

***Plaintiff Samuel Kaufman's Experience***

142. Plaintiff Kaufman does not know how or why Defendant came to possess his Private Information. To the best of his knowledge, Plaintiff Kaufman has never personally engaged Defendant for accounting, tax, retirement, or advisory services. Upon information and belief, Plaintiff Kaufman's Private Information was provided to Defendant by a third party, such as a current or former employer or other entity that is or was a Client of Defendant, without Plaintiff Kaufman's knowledge

or involvement.

143. On or about August 18, 2026, Plaintiff Kaufman received Defendant's written Notice, sent via U.S. mail, informing him that the Data Breach compromised his name, date of birth, and Social Security number.

144. Plaintiff Kaufman never consented to Defendant's collection or retention of his Private Information under inadequate data security. Had Plaintiff Kaufman known that his Private Information would be transferred to and stored by Defendant on a network protected by inadequate data security, he would have objected and taken steps to protect himself. Defendant obtained and, on information and belief, continues to maintain Plaintiff Kaufman's Private Information and has a continuing duty to protect it from unauthorized access and disclosure.

145. Plaintiff Kaufman suffered an invasion of privacy when his Private Information was exposed to, and obtained by, an unauthorized actor during the Data Breach.

146. Plaintiff Kaufman has in the past discovered unexplained charges on his financial accounts, although he is unable to recall when those charges occurred. The exposure of his Social Security number and date of birth—immutable identifiers that cannot be changed or cancelled—has placed Plaintiff Kaufman at a substantially increased and lifelong risk of identity theft and financial fraud.

147. Because the Private Information exposed in the Data Breach includes his Social Security number and date of birth, Plaintiff Kaufman must now monitor his financial accounts and credit reports indefinitely in order to detect misuse of his Private Information.

148. The Data Breach has caused Plaintiff Kaufman elevated stress and anxiety, which has been compounded by Defendant's failure to explain how or why it came to possess his Private Information in the first instance.

149. Cybercriminals frequently hold stolen Private Information for months or years before exploiting it, or sell it to others who do. That Plaintiff Kaufman has not yet identified a misuse of his Private Information, an increase in spam communications, or an extortion attempt does not mean that misuse will not occur; the risk created by the Data Breach remains latent, ongoing, and lifelong.

150. Upon receiving Defendant's Notice on or about August 18, 2026, Plaintiff Kaufman's anxiety and concern about the Data Breach were further aggravated.

151. Plaintiff Kaufman does not recall receiving notice of any other data breach involving his Private Information, and he has never before been a party to a lawsuit.

152. Defendant deprived Plaintiff Kaufman of the earliest opportunity to guard himself against the Data Breach's harmful effects by waiting nearly eight months to notify him of the Data Breach.

153. As a direct and traceable result of the Data Breach, Plaintiff Kaufman suffered actual injury and damages, including, but not limited to: (a) loss of privacy resulting from his Private Information being accessed and obtained by an unauthorized actor; (b) emotional distress, including elevated stress and anxiety; (c) the diminution in value of his Private Information; (d) the continued risk to his Private Information, which remains in Defendant's possession and subject to further unauthorized disclosure; and (e) imminent and impending injury arising from the increased risk of future fraud and identity theft now that his Private Information—including his immutable Social Security number and date of birth—has been compromised.

## CLASS ACTION ALLEGATIONS

154. Plaintiff brings this class action on behalf of himself and all others similarly situated pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3), and (c)(4) on behalf of a Nationwide Class and a New York Subclass, defined as follows:

> **Nationwide Class:** All individuals in the United States whose Private Information may have been compromised in the Data Breach, including all individuals who received a Notice (the

"Nationwide Class").

**New York Subclass:** All members of the Nationwide Class who resided in the State of New York at the time of the Data Breach (the "New York Subclass").

The Nationwide Class and the New York Subclass are referred to collectively as the "Class" unless otherwise specified.

155. Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

156. **Numerosity:** The Class is so numerous that joinder of all members is impracticable. Plaintiff alleges on information and belief that there are, at minimum, thousands of members in the Class described above. The exact size of the Class and the identities of its individual members are identifiable through Defendant's records, including but not limited to the files implicated in the Data Breach.

157. **Commonality:** Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

a. Whether Defendant unlawfully used, maintained, lost, or disclosed

Plaintiff's and Class Members' Private Information;

b. Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiff and members of the Class;

c. Whether Defendant knew or should have known of the data security vulnerabilities that allowed the Data Breach to occur;

d. Whether Defendant failed to adequately safeguard Private Information;

e. When Defendant actually learned of the Data Breach;

f. Whether Defendant adequately, promptly, and accurately informed Plaintiff and members of the Class that their Private Information had been compromised;

g. Whether Defendant's conduct violated the FTC Act;

h. Whether Defendant was unjustly enriched by failing to provide adequate security for Plaintiff's and Class Members' Private Information;

i. Whether Plaintiff and members of the Class are entitled to actual, consequential, nominal, statutory, and/or punitive damages as a result of Defendant's wrongful conduct; and

j. Whether Plaintiff and members of the Class are entitled to injunctive relief to redress the imminent and currently ongoing harm the Data

Breach caused.

158. **Typicality:** Plaintiff's claims are typical of the claims of other Class Members because Plaintiff and members of the Class were subject to the same unlawful conduct as alleged herein, and were damaged in the same way. Plaintiff's Private Information was in Defendant's possession and compromised due to the Data Breach. Plaintiff's damages and injuries are akin to those of other members of the Class, and Plaintiff seeks relief consistent with the relief of the Class.

159. **Adequacy:** Plaintiff is an adequate representative of the Class because he is a Class Member and is committed to pursuing this matter to obtain relief for the Class. Plaintiff has no conflicts of interest with the Class. Plaintiff's Counsel is competent and experienced in litigating class actions, including extensive experience in data breach and privacy litigation. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the interests of the Class.

160. **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to Plaintiff and members of the Class may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and members of the Class are relatively small compared to the burden and expense required to

individually litigate their claims against Defendant, and thus, individual litigation to redress Defendant's wrongful conduct would be impracticable and strain the court system, creating the potential for inconsistent or contradictory judgments and increasing the delay and expense to all involved. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

161. **Manageability:** The litigation of the class claims alleged herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of members of the Class demonstrate there would be no significant manageability problems with prosecuting this lawsuit as a class action. Adequate notice can be given to members of the Class directly using information maintained in Defendant's records.

162. **Ascertainability:** All members of the proposed Class are readily ascertainable. The Class is defined by reference to objective criteria, and there is an administratively feasible mechanism to determine who fits within the Class. Defendant has access to information regarding the individuals affected by the Data Breach, and Defendant has already provided notifications to some or all of those people. Using this information, the members of the Class can be identified, and their contact information ascertained for purposes of providing notice.

163. **Particular Issues:** Particular issues are appropriate for certification

under Rule 23(c)(4) because their resolution would advance the disposition of this matter and the parties' interests therein, including but not limited to the following:

a. Whether Defendant owed a legal duty to Plaintiff and members of the Class to exercise due care in collecting, storing, using, and safeguarding their Private Information;

b. Whether Defendant breached a legal duty to Plaintiff and members of the Class to exercise due care in collecting, storing, using, and safeguarding their Private Information;

c. Whether an implied contract existed between Defendant and members of the Class;

d. Whether Defendant adequately informed members of the Class of the Data Breach;

e. Whether members of the Class are entitled to actual, consequential, statutory, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

164. **Policies Generally Applicable to the Class:** Finally, class certification is also appropriate under Rule 23(b)(2) and (c). Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward members of the Class and making final injunctive relief appropriate with respect to

the Class as a whole. Defendant's policies challenged herein apply to and affect members of the Class uniformly, and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class, not on facts or law applicable only to Plaintiff.

## CAUSES OF ACTION

### COUNT I: NEGLIGENCE/NEGLIGENCE PER SE
**(On Behalf of Plaintiff and the Nationwide Class)**

165. Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1 through 164 as if fully set forth herein.

166. Defendant required Plaintiff and Class Members to submit, directly or indirectly, personal, confidential Private Information to Defendant as a condition of receiving—or of their employers receiving—accounting, tax, payroll, retirement, or advisory services.

167. Defendant had full knowledge of the sensitivity of the Private Information with which it was entrusted, and the types of harm that Plaintiff and Class Members could and would suffer if the Private Information was wrongfully disclosed to unauthorized persons. Defendant had duties to Plaintiff and each Class Member to exercise reasonable care in holding, safeguarding, and protecting their Private Information.

168. Plaintiff and Class Members were the foreseeable victims of any

inadequate safety and security practices by Defendant.

169. Defendant was able to ensure its systems and data security procedures were sufficient to protect against the foreseeable risk of harm to Plaintiff and Class Members from a cybersecurity event like this Data Breach, whereas Plaintiff and Class Members were not.

170. By collecting and storing Plaintiff's and Class Members' Private Information, Defendant had a duty of care to use reasonable means to secure and safeguard it, to prevent disclosure of the information, and to safeguard the Private Information from theft.

171. Defendant's duty of care obligated it to provide data security consistent with industry standards and legal and regulatory requirements, and to ensure that its systems and networks and the personnel responsible for them adequately protected Plaintiff's and Class Members' Private Information.

172. Defendant's duty of care further obligated it to ensure its data security processes to detect compromises of Private Information were sufficient.

173. Defendant had a duty to employ reasonable security measures under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

174. Pursuant to the FTC Act, Defendant had a duty to provide adequate data

security practices to safeguard Plaintiff's and Class Members' Private Information.

175. Defendant breached its duties to Plaintiff and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate security to safeguard Plaintiff's and Class Members' Private Information, and by failing to ensure Private Information was encrypted and timely deleted when no longer needed.

176. Defendant breached its duty to Plaintiff and Class Members under the FTC Act to offer fair, reasonable, or adequate security to safeguard Plaintiff's and Class Members' Private Information.

177. Defendant's violations of the FTC Act directly caused and/or were a substantial factor in the Data Breach and resulting injuries to Plaintiff and Class Members.

178. Plaintiff and Class Members are within the class of persons the FTC Act was intended to protect.

179. The type of harm that resulted from the Data Breach was the type of harm the FTC Act was intended to guard against.

180. Defendant's failures to comply with the FTC Act constitute negligence per se.

181. Defendant breached its duties and was negligent by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information from unauthorized disclosure in the Data Breach. The specific negligent acts and

omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' Private Information;

b. Failing to adequately train employees on proper cybersecurity protocols;

c. Failing to adequately monitor the security of its networks and systems;

d. Failing to require and periodically ensure that its vendors adopted, implemented, and maintained adequate security measures to safeguard Private Information;

e. Failing to require and periodically ensure its network systems had plans in place to maintain reasonable data security safeguards; and

f. Allowing unauthorized access to Plaintiff's and Class Members' Private Information despite the foreseeable risk.

182. But for Defendant's wrongful and negligent breaches of its duties owed to Plaintiff and Class Members, the Data Breach would not have occurred or at least would have been mitigated, Plaintiff's and Class Members' Private Information would not have been compromised, and Plaintiff's and Class Members' injuries would have been avoided.

183. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered and will suffer injuries and damages, including but not limited to (a) invasion of privacy; (b) diminished value of Private Information; (c) actual identity theft and fraud; (d) lost opportunity costs associated with mitigating the consequences of the Data Breach, including but not limited to lost time; and (e) the continued and increased risk to their Private Information, which remains subject to further unauthorized disclosures so long as Defendant fails to undertake adequate measures to protect it.

184. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered and will continue to suffer other forms of injuries and/or harm, including, but not limited to emotional distress, loss of privacy, and other economic and non-economic losses.

185. Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

**COUNT II: BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Nationwide Class)**

186. Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1 through 164 as if fully set forth herein.

187. Defendant required Plaintiff and Class Members to provide and entrust their Private Information, directly or indirectly, as a condition of obtaining

accounting, tax, payroll, retirement, or advisory services.

188. When Plaintiff and Class Members provided their Private Information to Defendant, they formed implied contracts pursuant to which Defendant agreed to safeguard and protect such Private Information and to timely and accurately notify Plaintiff and Class Members if and when their Private Information was breached and compromised.

189. The valid and enforceable implied contracts Plaintiff and Class Members formed with Defendant included Defendant's implied promises to protect Plaintiff's and Class Members' Private Information from unauthorized disclosures.

190. Defendant promised Plaintiff and Class Members, including through its privacy policy, to maintain the privacy and confidentiality of the Private Information it collected and to keep such information safeguarded against unauthorized access and disclosure.

191. Defendant's adequate protection of Plaintiff's and Class Members' Private Information was a material aspect of these implied contracts with Defendant.

192. In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with industry standards and relevant laws and regulations, including the FTC Act.

193. Plaintiff and Class Members who provided their Private Information to Defendant reasonably believed and expected that Defendant would adequately

employ reasonable data security to protect that Private Information and would audit or monitor any vendors handling their Private Information. Defendant failed to do so.

194. A meeting of the minds occurred when Defendant required Plaintiff and Class Members to provide their Private Information, directly or through Defendant's Clients, as a mandatory condition of the services Defendant provided, and when Plaintiff and Class Members provided, or permitted the provision of, their Private Information to Defendant.

195. Defendant materially breached its contractual obligations to protect the Private Information it required Plaintiff and Class Members to provide when that Private Information was unauthorizedly disclosed in the Data Breach due to its inadequate data security measures and procedures.

196. Defendant materially breached its contractual obligations to deal in good faith with Plaintiff and Class Members when it failed to take adequate precautions to prevent the Data Breach and failed to promptly notify Plaintiff and Class Members of the Data Breach.

197. Defendant materially breached the terms of its implied contracts by failing to comply with industry standards or the standards of conduct embodied in statutes like Section 5 of the FTC Act, and by failing to otherwise protect Plaintiff's and Class Members' Private Information as set forth above.

198. The Data Breach was a reasonably foreseeable consequence of Defendant's conduct in breach of these implied contracts with Plaintiff and Class Members.

199. As a direct and proximate result of Defendant's breach of its implied contracts with Plaintiff and Class Members and the resulting Data Breach, Plaintiff and Class Members have suffered injuries and damages as set forth herein and have been irreparably harmed, as well as suffering and the loss of the benefit of the bargain they struck with Defendant.

200. Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, and/or restitution, in an amount to be proven at trial.

**COUNT III: QUASI-CONTRACT/UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Nationwide Class)**

201. Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1 through 164 as if fully set forth herein.

202. Plaintiff brings this claim in the alternative to his breach of implied contract claim.

203. Plaintiff and Class Members conferred benefits on Defendant by way of providing their Private Information as part of Defendant's business operations.

204. Defendant required Plaintiff's and Class Members' Private Information

to conduct business.

205. Defendant knew that Plaintiff and Class Members conferred a benefit upon it and accepted and retained that benefit by accepting and retaining the Private Information entrusted to it. Defendant profited from its collection of Plaintiff's and Class Members' Private Information and used Plaintiff's and Class Members' Private Information for business purposes.

206. Defendant failed to secure Plaintiff's and Class Members' Private Information and, therefore, did not fully compensate Plaintiff and Class Members for the value that their Private Information provided.

207. Defendant acquired Plaintiff's and Class Members' Private Information through inequitable means because it failed to investigate and/or disclose the inadequate data security practices previously alleged.

208. If Plaintiff and Class Members had known that Defendant would not implement and maintain adequate data security practices to monitor, supervise, and secure their Private Information, they would not have entrusted their Private Information to Defendant.

209. Plaintiff and Class Members may not have an adequate remedy at law.

210. Under principles of equity and good conscience, Defendant should not be permitted to retain its ill-gotten gains because it failed to provide adequate safeguards and security measures to protect Plaintiff's and Class Members' Private

Information, which Plaintiff and Class Members did not receive.

211. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of their bargain; (vi) nominal damages; and (vii) the continued and increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect their Private Information.

212. Due to Defendant's unjust enrichment, Plaintiff and Class Members are entitled to restitution and disgorgement of profits obtained by Defendant.

213. Plaintiff may not have an adequate remedy at law against Defendant, and accordingly, he pleads this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

## COUNT IV: DECLARATORY JUDGMENT
**(On Behalf of Plaintiff and the Nationwide Class)**

214. Plaintiff re-alleges and incorporates by reference the allegations in

paragraphs 1 through 164 as if fully set forth herein.

215. Under the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

216. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendant owes a legal duty to secure customers' Private Information and to timely notify impacted individuals of a data breach under the common law and various state statutes; and

b. Defendant continues to breach this legal duty by failing to employ reasonable measures to secure Private Information in its possession.

217. This Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with law and industry standards to protect Private Information in Defendant's data networks.

218. If an injunction is not issued, Plaintiff will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach by Defendant. The risk of another such breach is real, immediate, and substantial. If another breach occurs, Plaintiff will not have an adequate remedy at law because many of the

resulting injuries are not readily quantified and he will be forced to bring multiple lawsuits to rectify the same conduct.

219. The hardship to Plaintiff if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Plaintiff will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

220. Issuance of the requested injunction will not disserve the public interest. In contrast, such an injunction would benefit the public by preventing another data breach by Defendant, thus eliminating the additional injuries that would result to individuals such as Plaintiff and Class Members whose confidential information would be further compromised.

**COUNT V: VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW, N.Y. GEN. BUS. LAW § 349**
**(On Behalf of Plaintiff and the New York Subclass)**

221. Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1 through 164 as if fully set forth herein.

222. N.Y. Gen. Bus. Law § 349(a) provides: "Deceptive acts or practices in the conduct of any business, trade or commerce in the furnishing of any service in this state are hereby declared unlawful."

223. Defendant engaged in deceptive acts or practices in the conduct of business and in the furnishing of services in New York, in violation of N.Y. Gen. Bus. Law § 349(a), by, among other things: (a) omitting and concealing the material fact that it did not employ reasonable measures to secure the Private Information of Plaintiff and the New York Subclass, which it could and should have disclosed before accepting that Private Information or by any other means reasonably calculated to inform them of its inadequate data security; (b) making implied representations that its data security practices were sufficient to protect that Private Information, when by virtue of soliciting and accepting the Private Information Defendant implicitly represented that its data security was adequate, and those representations were false and misleading; (c) failing to adopt reasonable safeguards to protect the Private Information of Plaintiff and the New York Subclass in violation of N.Y. Gen. Bus. Law § 899-bb, which provides that "[a]ny person or business that owns or licenses computerized data which includes private information of a resident of New York shall develop, implement and maintain reasonable safeguards to protect the security, confidentiality and integrity of the private information," and that "[a]ny person or business that fails to comply with this subdivision shall be deemed to have violated section three hundred forty-nine of this chapter"; and (d) omitting and concealing the material fact that it did not comply with common law and

statutory duties pertaining to data security, including the duties imposed by the FTC Act, 15 U.S.C. § 45.

224. Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and its ability to protect the confidentiality of the Private Information of Plaintiff and the New York Subclass.

225. N.Y. Gen. Bus. Law § 349(h) provides that "any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions," that "[t]he court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section," and that "[t]he court may award reasonable attorney's fees to a prevailing plaintiff."

226. The damages suffered by Plaintiff and the New York Subclass alleged herein satisfy both the "injured" and "actual damages" requirements of N.Y. Gen. Bus. Law § 349(h). Plaintiff and the New York Subclass have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and nonmonetary damages, including an increased and imminent risk of fraud and identity theft, time and expense related to monitoring their financial accounts and

credit reports, diminution in the value of their Private Information, and loss of privacy.

227. Plaintiff and the New York Subclass are entitled to treble damages of up to $1,000 under N.Y. Gen. Bus. Law § 349(h) because Defendant willfully or knowingly violated N.Y. Gen. Bus. Law § 349(a). Defendant knew or should have known that its data security practices were deficient. Given the volume and sensitivity of the Private Information in Defendant's possession, Defendant knew or should have known that it would be a likely target for cyberattacks and should have been aware of the shortcomings in its data security. Defendant also failed to encrypt or redact the Private Information in its possession.

228. Defendant's deceptive and unlawful practices affected the public interest and consumers at large, including the New York residents whose Private Information was compromised in the Data Breach.

229. Defendant's deceptive and unlawful practices caused substantial injury to Plaintiff and the New York Subclass that they could not reasonably have avoided.

230. Plaintiff and the New York Subclass are entitled to the injunctive relief sought herein because, among other things, Defendant continues to retain their Private Information and may subject that Private Information to further data breaches unless injunctive relief is granted.

231. Plaintiff and the New York Subclass seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $50 (whichever is greater), treble damages, injunctive relief, and attorneys' fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and all others similarly situated, prays for judgment as follows:

A. An Order certifying this case as a class action on behalf of the proposed Class, appointing Plaintiff as class representative, and appointing his counsel to represent the Class;

B. Awarding Plaintiff and the Class damages that include applicable compensatory, actual, statutory, nominal, exemplary, and punitive damages, as allowed by law;

C. Awarding Plaintiff and the New York Subclass statutory damages, treble damages, and attorneys' fees pursuant to N.Y. Gen. Bus. Law § 349(h);

D. Awarding restitution to Plaintiff and the Class;

E. Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiff and the Class;

F. Awarding injunctive relief in the form of additional technical and administrative cybersecurity controls as is necessary to protect the interests of

Plaintiff and the Class;

G. Enjoining Defendant from further deceptive practices and making untrue statements about its data security, the Data Breach, and the transmitted Private Information;

H. Awarding attorneys' fees and costs, as allowed by law;

I. Awarding prejudgment and post-judgment interest, as provided by law; and

J. Awarding such further relief to which Plaintiff and the Class are entitled.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

**CERTIFICATION OF COMPLIANCE**

Pursuant to Local Rule 7.1(D), this Complaint has been the brief has been prepared with one of the font and point selections approved by the Court in LR 5.1(B).

Dated: August 28, 2026

Respectfully submitted,

/s/ *Casondra Turner*
Casondra Turner (GA Bar No. 418426)
**MILBERG, PLLC**
260 Peachtree Street NW, Suite 2200
Atlanta, GA 30303
(771) 772-3086
ctumer@milberg.com

M. Anderson Berry*
Gregory Haroutunian*
**EMERY REDDY, PC**
333 University Ave, Suite 200
Sacramento, CA 95825
Tel: (916) 823-6955
Fax: (206) 441-9711
anderson@emeryreddy.com
gregory@emeryreddy.com
**Pro hac vice forthcoming*